UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
ANDREW SHEA,

                Plaintiff,            05 Civ. 9768 (LLS)

      v.                     OPINION AND ORDER

LONG ISLAND RAILROAD COMPANY,

                Defendant.
------------------------------------x

      Plaintiff sues under the Federal Employers' Liability Act, 45 U.S.C. § 51 et seq., for alleged physical and psychological injuries sustained in an accident at work.

      He now moves in limine under Daubert v. Merrell Dow Pharmaceuticals, Inc., 113 S. Ct. 2786 (1993) and its progeny, and, inter alia, Federal Rule of Evidence 702, to exclude testimony of defendant's experts, psychologist Richard Vickers, Ph.D and psychiatrist and neurologist William Head, M.D.  Mr. Shea seeks to preclude Dr. Vickers and Dr. Head from testifying in reliance upon or referring to the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") which Dr. Vickers administered to Mr. Shea.  Shea argues that Dr. Vickers did not reliably interpret his MMPI-2 results, and therefore Dr. Head in turn should not be allowed to rely on Dr. Vickers's report on the MMPI-2.  Mr. Shea also argues that certain of Dr. Vickers's opinions are inadmissible as speculation.

      The admissibility of expert testimony is governed by Fed. R. Evid. 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Supreme Court held in Daubert that under Rule 702 "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 113 S. Ct. at 2795. The subject of an expert's testimony must have "a grounding in the methods and procedures of science" and be "more than subjective belief or unsupported speculation." Id.; see also Kumho Tire Co., Ltd. v. Carmichael, 119 S. Ct. 1167, 1176 (1999) (district court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"). The "inquiry envisioned by Rule 702 is . . . a flexible one, and the gatekeeping inquiry must be tied to the facts of a particular case." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002) (alteration in original) (internal quotation marks and citations omitted).

"In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached

or the district court's belief as to the correctness of those conclusions." Id. However, the Supreme Court recognized in Gen. Elec. Co. v. Joiner, 118 S. Ct. 512, 519 (1997):

> . . . conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

"Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." Amorgianos, 303 F.3d at 266.

## A.   TESTIMONY REGARDING THE MMPI-2

### 1.   Dr. Vickers's Qualifications, Methodology and Opinions

Dr. Vickers received a Ph.D in clinical psychology from the University of Minnesota in 1973. Vickers Apr. 9, 2009 Aff. ¶ 3. He is a licensed psychologist in private practice in New York. Id. ¶¶ 1, 4. He has administered and interpreted over 3,000 MMPI tests. Id. ¶ 11.

Dr. Vickers administered the MMPI-2 to Mr. Shea on March 27, 2007 as one source of data he used "to assess Mr. S's mental state, including presence or absence of diagnosable mental disorder." Vickers Apr. 20, 2007 Rep. 1 (Wietzke Mar. 27, 2009

Aff. Ex. 1). Dr. Vickers states that the MMPI-2 is "highly reliable" and "well represented in the peer-reviewed literature, with approximately 250 MMPI-2 studies published per year" and its "Retest coefficients for 8 of the 10 basic scales surpass .80, and validity coefficients can approach 100%." Id. at 6.

Based on Mr. Shea's MMPI-2 results, Dr. Vickers opines that Shea "magnified and overreported symptoms when taking this test." Id. at 10. He also relies in part on the MMPI-2 to opine that Shea's "depressed mood and hopelessness are tied to intensified focus on perceived injury." Id. More generally, Dr. Vickers reached the "Impression that Mr. Shea exaggerated symptoms." Vickers July 23, 2007 letter to Mr. Krez 1 (Wietzke Mar. 27, 2009 Aff. Ex. 4).

Those opinions are grounded in the data from Mr. Shea's MMPI-2 results. Mr. Shea "reported that he suffers from more symptoms than 99% of [2600] individuals tested in the normative sample," and his score on the MMPI-2's scale "designed to measure vague and chronic physical problems" was "more than 99% over the average score in the community sample." Vickers Rep. 8. He received elevated scores "on scales which reflect focus on suffering" and "compulsive brooding and rumination" while "Scales which measure key components of PTSD" (Post-Traumatic Stress Disorder) were "scored near the average range." Id. at 10. Dr. Vickers shows similarities between Shea's results and

model results for symptom exaggeration from Kenneth S. Pope et al., The MMPI, MMPI-2 & MMPI-A in Court:  A Practical Guide for Expert Witnesses and Attorneys (American Psychological Association 1993) [hereinafter "Pope et al."], an authority relied on by both parties.

Dr. Vickers did not interpret Mr. Shea's MMPI-2 results in isolation.  He reviewed Mr. Shea's medical records from his treating psychologist at New York Mental Health Services ("NYMHS"), Dr. Waldman, and conducted a clinical interview with Mr. Shea.  That is in accord with the admonishment of Pope et al. regarding MMPI-2 interpretation:

> But expert witnesses conducting assessments have a responsibility to conduct an adequate review of records and to inquire specifically about incidents that may affect the interpretation of test results, even if the incidents occurred long ago.
>
> Without a structured interview and adequate review of records, it is easy to arrive at compelling but thoroughly misinformed and misleading conclusions.

Pope et al. 68 (Wietzke Apr. 17, 2009 Aff. Ex. 3).

Data from Mr. Shea's medical records and clinical interview also support Dr. Vickers's opinions.  "The NYMHS treatment summary written on 5/22/03 reports that Mr. S 'fully' recovered from PTSD after four months of treatment," and "Full recovery after four months, with treatment, implies that symptoms of this disorder had a limited impact on Mr. S's life."  Vickers Rep. 4. Records from Mr. Shea's second treatment at NYMHS in 2005 "again

report a rapid recovery from a serious mental disorder." <u>Id.</u> Based on his interview with Mr. Shea, Dr. Vickers found that "His interest in losing weight and coaching his daughter's team indicate that hopelessness does not interfere with goal directed thinking, and that he remains able to experience enthusiasm and pleasure." <u>Id.</u> at 5.

In light of the foregoing, defendant has established that Dr. Vickers's opinions based on the MMPI-2 are relevant and (1) presented by a qualified expert, (2) based upon sufficient facts or data, and (3) the product of reliable principles and methods. <u>See</u> Fed. R. Evid. 702.

**2.   Reliability of Dr. Vickers's MMPI-2 Interpretation**

The crux of Mr. Shea's objection, however, is that Dr. Vickers has not applied the principles and methods reliably to his case because, in interpreting his MMPI-2 results, Dr. Vickers "cherry picked which scales to discuss" (Pl.'s Reply 2) and failed to consider alternative explanations for Shea's scores, in order to reach a defense-oriented conclusion.

Mr. Shea identifies several examples of Dr. Vickers's alleged biased interpretation of his MMPI-2 results. He argues that Dr. Vickers failed to discuss the MMPI-2's F(P) scale, which "is the only validity scale in the entire MMPI-2 which measures responses of patients who are genuinely mentally ill and not faking and the plaintiff fell within the valid range."

Pl.'s Mem. 13, citing James N. Butcher & Carolyn L. Williams, Essentials of MMPI-2 and MMPI-A Interpretation (University of Minnesota Press 2d ed. 2000) [hereinafter "Butcher & Williams"]; Pope et al. (3d ed. 2006).  He argues that "what Dr. Vickers leaves out, is that the *only* scale in the MMPI-2 which measures PTSD, the PK scale, is *highly* elevated (T score 80) indicating the existence of PTSD." (plaintiff's emphasis) Id. at 15, citing Butcher & Williams.   In addition, Mr. Shea argues that Dr. Vickers's conclusion that his elevated F scale score "indicates exaggeration and overreporting of symptoms" (Vickers Rep. 7) is biased because elevated F scale scores can be caused by stressful circumstances in the individual's life, and by extreme psychopathology.   Pl.'s Mem. 12, citing Pope et al.   Mr. Shea also argues that his medications, including Lunesta and Topamax, may explain his scores.

Dr. Vickers rebuts, explaining how he has considered, and ruled out, each of Mr. Shea's alternative interpretations and explanations of his MMPI-2 results, based on cited authorities from his field (including the MMPI-2 manual), his clinical observations, and his professional judgment.   See U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3, AFL-CIO, 313 F. Supp. 2d 213, 239 (S.D.N.Y. 2004) (expert "need only demonstrate that he has 'adequately accounted' for alternative explanations; he does not need to prove that his opinions are in

fact more likely than the suggested alternatives," citing Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments); <u>Green Mtn. Chrysler Plymouth Dodge Jeep v. Crombie</u>, 508 F. Supp. 2d 295, 317 n.21 (D. Vt. 2007) ("Hansen's response demonstrated his familiarity with the data that Christy referenced, and referenced additional data to support his position.  These differences in the experts' interpretations of the available data are not grounds for the exclusion of Hansen's testimony.").

For example, Dr. Vickers explains his decision to discount Mr. Shea's scores on certain MMPI-2 scales.  He explains that "Use of this [F(P)] scale in non-clinical populations is inappropriate" since "Research on F(P), which refers to 'Infrequency Psychopathology,' was conducted on psychiatric **inpatients**" and Shea was not "a hospitalized psychiatric patient in 2007."  Vickers Aff. ¶ 19 (emphasis in original).  He did not give controlling weight to the PK scale, although recognizing that Shea's score "should be considered highly elevated," because "Controversy exists regarding application of this scale to 'others,' meaning to civilian non-combatants who have experienced traumatic events."  <u>Id.</u> ¶ 21, citing Robert Archer, <u>Forensic Uses of Clinical Assessment Instruments</u> (2006) for the proposition that utility of the PK scale is limited to combat veterans.

Dr. Vickers also explains why he ruled out alternative explanations for Mr. Shea's elevated scores.  He admits that, as

an alternative to reflecting exaggeration, "high F scale scores can reflect the **extreme levels of psychopathology** suffered by psychiatric inpatients," but he explains that "Patients with such problems are hospitalized." Id. ¶ 14 (emphasis in original). By contrast, "plaintiff was not, and never had been hospitalized in a psychiatric hospital when I evaluated him in 2007," and "He was not suffering from extreme levels of psychopathology." Id. Dr. Vickers also rules out stress, quoting Pope, et al. (id. ¶ 15):

> Stressful life circumstances tend to be associated with elevated scores. F-scale elevation was associated with increased distress and an increase in neurotic symptomatology in individuals who were being systematically starved to 75% of their body weight in the Minnesota Experimental Semistarvation Studies during World War II (Keys, 1946, Brozek and Schiele (1948). Another obvious stressful situation that produce [sic] extremely high F scores is admission to an inpatient psychiatric hospital or incarceration in a correctional facility.

Dr. Vickers states that "While I have no doubt that the plaintiff's accident in 2003 was a harrowing experience, he was not being starved, hospitalized, or incarcerated when I interviewed him in 2007." Id. ¶ 16. Instead, "The plaintiff's F scale T score of 76 falls into the 'high' range of scores associated with 'exaggeration' in non-clinical settings, according to the latest edition of the Manual for Administration, Scoring, and Interpretation of the MMPI-2." Id. He also rules out Mr. Shea's medications as an explanation for his scores. Although Shea "was taking six medications at the

time of testing," (Vickers Rep. 2), Dr. Vickers explains:  "If Mr. Shea's medications caused him to become confused, somnolent, or unable to concentrate, he would have produced test scores that were frankly invalid.  This was not the case.  I spoke with him at length and he was awake, alert and oriented the entire time."  Vickers Aff. ¶ 23.

Dr. Vickers's opinions based on Mr. Shea's MMPI-2 results and the reasoning underlying them are explained in detail in his report and affidavit, and he grounds the opinions in the data on Shea's test results, as well as his review of Shea's medical records and his clinical interview.  This is not a situation where the expert's opinions are "connected to existing data only by the ipse dixit of the expert."  Joiner, 118 S. Ct. at 519. Mr. Shea has not shown, and there is no reason to believe, that Dr. Vickers's approach to interpretation of his MMPI-2 results was unreliable, or that it differed materially from the approach applied by clinicians in his field every day.  Cf.  Foreman v. Am. Road Lines, Inc., No. 07-0129-WS-C, 2008 WL 5245342, at *6 (S.D. Ala. Dec. 16, 2008):

> If Harris were correct in classifying Dr. Davis's opinions as speculative guesses because they are not in lockstep with objective test results, but instead proceed from his professional judgment based on other data sources and impressions, then precious few expert witnesses in the social sciences would ever be allowed to testify in federal court.  That there is an element of clinical judgment in Dr. Davis's opinions does not render them unreliable or inadmissible.

If certain MMPI-2 scales may be used to challenge Dr. Vickers's opinions, or there are weaknesses in his reasons for discounting alternative explanations for Mr. Shea's elevated scores, the remedy is not preclusion but cross-examination and presentation of contrary evidence. <u>See</u> <u>id.</u> ("To the extent that Dr. Davis's opinions diverge from objective tests administered to Harris [which included the MMPI-2], such differences may be fodder for robust cross-examination, but do not warrant outright exclusion of his testimony.") (insertion added); <u>see also</u> <u>Amorgianos</u>, 303 F.3d at 267:

> "The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." <u>In re Paoli</u>, 35 F.3d at 746; <u>see</u> <u>Daubert</u>, 509 U.S. at 590, 113 S.Ct. 2786. This limitation on when evidence should be excluded accords with the liberal admissibility standards of the federal rules and recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony.

Objections that Dr. Vickers is biased because he "is a professional witness who is paid by the defense to testify in this case" (Pl.'s Reply 2); that Dr. Vickers should not be able to opine that Shea's "depressed mood and hopelessness are tied to intensified focus on perceived injury" since Dr. Vickers is not a medical doctor and thus did not conduct a physical examination of Shea; that Dr. Vickers's opinion that Shea "does not report current suicidal ideation" contradicts Shea's answers to certain MMPI-2 questions; or that Shea has explanations for

his answers to MMPI-2 questions that produced his elevated F scale score, go to the weight of Dr. Vickers's testimony, not its admissibility.

There is one exception.  Mr. Shea objects to Dr. Vickers's reference to the MMPI-2's F scale, which registers "Attempts to deny, fake, or exaggerate symptoms" (Vickers Rep. 6), as the "Fake Bad" scale.  Since use of the name "Fake Bad," as opposed to the scale's alternative names F scale or infrequency scale (see id. at 7; Pl.'s Reply 3), has some risk of unfair prejudice, and defendant does not show that the epithet "Fake Bad" has any particular value in this case, its use will be precluded under Fed. R. Evid. 403.  Defendant's counsel is responsible for so instructing his witnesses.

### 3.   Dr. Head's Reliance on Dr. Vickers's Report

Dr. Head is a medical doctor licensed in New York and New Jersey and Board Certified in neurology and psychiatry.  Head Apr. 5, 2007 Rep. 16 (Wietzke Mar. 27, 2009 Aff. Ex. 6); see also Head Sept. 7, 2007 Aff. ¶¶ 1, 2.  He conducted a neurological and psychiatric examination of Mr. Shea on April 5, 2007 and concluded that (i) he "could find no objective neurological evidence of any neurological condition that could account for Mr. Shea's pain complaints, which appeared to be functional;" (ii) "Mr. Shea became tearful and started hyperventilating when he described his accident, but all of

these manifestations were under his conscious control;" and (iii) "His claim of persistent Post Traumatic Stress Disorder since January 17, 2003, or for more than 4 years, in the absence of a prior psychiatric condition, would appear to be most unusual and suggests an element of exaggeration on his part." Head Rep. 15.

Dr. Head subsequently reviewed Dr. Vickers's April 20, 2007 report, and he observed that "It was my opinion that Mr. Shea was exaggerating, just as Dr. Vickers found when he performed MMPI-2 testing."  Head Aug. 3, 2007 Rep. 5 (Wietzke Mar. 27, 2009 Aff. Ex. 7).

Since Dr. Vickers's opinions based on the MMPI-2 are sufficiently reliable, Dr. Head could properly rely on them as support for his own opinions.  See Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments ("The term 'data' is intended to encompass the reliable opinions of other experts.").

B.   **REMAINING OBJECTIONS TO DR. VICKERS'S OPINIONS**

Mr. Shea also objects to certain of Dr. Vickers's opinions as speculative.

### 1.   PTSD and MDD (**Major Depressive Disorder) Following the Accident**

Mr. Shea objects to Dr. Vickers's opinions on page ten of his report that Shea "may have suffered from PTSD and MDD during 2003 and 2005" but that "his symptoms may not have been as pervasive or severe as they were described to be during his

initial appearance at NYMHS on 1/27/03." Vickers Rep. 10.

Dr. Vickers sufficiently supports those opinions with the data from Mr. Shea's NYMHS medical records.

He explains the basis for his opinion that Mr. Shea may have suffered from PTSD following the accident (id. at 3-4):

> Standard criteria for diagnosis of PTSD require presence of least [sic] six of seventeen symptoms. A specific pattern of symptoms must fall into three categories: (1) at least one symptom which involves a reexperiencing of the precipitating trauma, (2) three symptoms which involve avoidance and numbing, and (3) two symptoms of increased arousal. These symptoms must continue to cause significant distress or impairment. The intake summary completed on 1/27/03, ten days after his accident, indicated that Mr. S suffered from six symptoms of PTSD. Two symptoms fell into the first category: (1) nightmares, and (2) reexperiencing of trauma as the sensation of the machine on his chest, and "seeing the piece of mechanical equipment flying back at him and pinning him." One symptom fell into the second category: Mr. S's feeling that he was "living on borrowed time." Three symptoms fell into the third category: (1) insomnia, (2) difficulty concentrating and (3) a short temper.

Dr. Vickers also explains the basis for his opinion that Mr. Shea's PTSD may not have been as severe as initially reported (id. at 4):

> There are two reasons for characterizing Mr. S's PTSD as mild/moderate, rather than full blown and severe: (1) he did not feel compelled to restrict his life and avoid activities after his accident at work. He was described as "looking forward to going back to work" on 3/20/03, eight weeks after the accident, as "not the type who wants to sit around and not do his job" on 3/27/03, and as "increasingly" wanting to get himself back to work on 4/10/03, 4/15/03, and 4/29/03. (2) The same notes describe a rapid recovery from the emotional consequences of his accident. The NYMHS treatment summary written on 5/22/03 reports that Mr. S

- 14 -

"fully" recovered from PTSD after four months of treatment. Complete recovery occurs within three months, without treatment, in approximately 50% of cases of PTSD (DSM IV page 426). Full recovery after four months, with treatment, implies that symptoms of this disorder had a limited impact on Mr. S's life.

As for his opinion that Mr. Shea may have suffered from MDD following the accident, Dr. Vickers explains that Shea "returned to see Dr. Waldman on 5/2/05, approximately 26 months after recovering from PTSD" and "He was diagnosed as suffering from a different psychiatric condition, severe Major Depressive Disorder." Id. Mr. Shea's symptoms were different from his earlier PTSD because "These notes refer to frustration and problems with coworkers, rather than anxiety based symptoms related to PTSD" and "he was not afraid to return to work, as might be the case if there were a recurrence of PTSD." Id.

Dr. Vickers concludes that "Records from this second treatment at NYMHS again report a rapid recovery from a serious mental disorder" because Shea (id.)

> . . . told Dr. Waldman that he was "actually beginning to feel like a new man" on 11/8/05, shortly after he left work and she noted that he appeared "for the first time in a long time in a really good mood, and actually looks happy" on 12/13/05, seven months after he began treatment.

Thus, Dr. Vickers has shown that he has "good grounds" based on the data from Mr. Shea's medical records for his opinions regarding Shea's PTSD and MDD following the accident, and that those opinions are "more than subjective belief or

unsupported speculation." <u>Daubert</u>, 113 S. Ct. at 2795.

### 2.   Existence of Symptoms Before the Accident

Mr. Shea also objects to Dr. Vickers's opinion on page nine of his report that "chronic adjustment problems including anxiety, poor self-esteem, chronic depression, and substance abuse" associated with Mr. Shea's MMPI-2 scores "may be problems which affected Mr. S well before the time of his accident at work." Vickers Rep. 9.

Dr. Vickers does not furnish any reasoning for that opinion, and there do not appear to be sufficient data in his report to support it. Dr. Vickers does not state that he reviewed any of Shea's medical records from before the accident; indeed, he states that "There is no report of psychiatric diagnosis prior to" the accident. <u>Id.</u> at 3. His report on his interview with Shea is also an insufficient basis to opine reliably on Shea's mental health prior to the accident. Dr. Head reports that Shea "denies any past history of a similar accident or similar symptoms," "denies ever having undergone psychological care or psychiatric care, in the past," and "denies any history of excessive alcohol use." Head Rep. 5, 6.

Accordingly, on this record, Dr. Vickers's opinion that certain problems may have affected Mr. Shea before the accident is inadmissible as speculation. <u>See</u> <u>Boucher v. U.S. Suzuki Motor Corp.</u>, 73 F.3d 18, 21 (1996) ("expert testimony should be

excluded if it is speculative or conjectural").

## C.   DEFENDANT'S REQUEST FOR COSTS

In his affidavit in opposition to this motion, defense counsel requests "costs associated with the necessary preparation of Dr. Vickers' affidavit." Krez Apr. 9, 2009 Aff. at 5.   Since Mr. Shea's motion is granted in part, defendant's informal request for costs is denied.

## D.   DAUBERT HEARING

Since the parties' written submissions adequately address the issues, Mr. Shea's request for a further oral testimonial Daubert hearing is denied.

### CONCLUSION

Mr. Shea's motion in limine to preclude Dr. Vickers and Dr. Head from testifying in reliance upon or referring to the MMPI-2 is denied, except they are precluded from referring to the MMPI-2's F scale as the "Fake Bad" scale.

Dr. Vickers's unsupported opinion on page nine of his report that certain problems may have affected Mr. Shea before the accident is inadmissible.

Defendant's request for costs is denied.

So ordered.

DATED:   New York, New York
         May 20, 2009

Louis L. Stanton
LOUIS L. STANTON
U.S.D.J.